’FREEMA.N, J.,
delivered the opinion of the Court.
The bill, and amended bill, were filed in this case, the first to .enjoin defendants from collecting notes given for the purchase of one hundred acres of land, lying near the town of Shelbyville, Bedford County, “until they can show a good title to said land; or if this can not be done, that said-contract be rescinded.”
The bill alleges the purchase of the land 26th January, 1856, and that three notes of $2,314.50 each, were given for the purchase money, payable in one, two and three years, from 9th of January, 1856, with complainant Cannon as surety.
The grounds for the relief sought in this bill are, that complainants had no title to 75 acres of the land, and the bill goes on to specify the defects in the title. This is, however, disposed of by the answer and exhibition of title to this part of the land; so that as to this part of the bill, the case need not be further noticed.
The bill, however, charges that as to the balance of the land, 25 acres, on -which the improvements and only lasting water on the place were situated, the title was in one Nathan Ivey, and had never passed out of him by deed or bond, nor been barred by the statutes of limitation, this part of the tract having only been in actual adverse possession for about three years.
This bill was filed 29th December, 1857, and- at February Term, 1858, on coming in of the answer, the Chancel *539 lor dissolved the injunction so far as to allow tbe defendants to proceed to judgment in the Circuit Court on the notes, but not to have execution till further order of the Court.
Complainants by leave of Court granted them, filed the amended bill in this case, 22nd August, 1859, in which they claim a rescission of the contract on the ground of fraud, charging that the sale was at “public outcry,” that Jones, and Aiken and wife, were all present at the sale, and it was publicly announced at the sale to the crowd assembled, that the title to the land was good and unquestioned;” and relying on these statements, complainant Mullins had purchased the land. '
Complainants then go on to show the falsity of these assertions as to the title, by alleging that the’ title to the 25 acres referred to in the original -bill had been in one John G. Sims, who had died in Williamson County, Tennessee, leaving three minor children to whom the land descended; that when the oldest of these children became of age, upon an ex parte petition by him and the two minors, filed in the Chancery Court of Williamson County, this land, with other lánd lying in Bedford County, was ordered to be sold for partition, or because it was to the interest of petitioners to sell; that none of the land lay in Williamson County, nor did any of the parties live in Bedford County; and that Ivey either purchased at the sale, or from parties who had so purchased about one hundred and fifty acres of land, of which this 25 acres was a part.
They charge that there never was any adverse possession of this 25 acres of land, as against the heirs of John *540 G. Sims, until 1854; that John G. Sims died in 1844, and the title was still in his heirs.
An answer on oath to this amended bill was waived.
Aiken and wife, and Jones, answered the original bill, and after setting out their title to the seventy-five acres, with an explanation of the difficulties suggested by complainants in the deraignment of the title, they say that as, to the 25 acres they are informed and believe that it is probably true, that the naked legal title to said land is in Nathan Ivey, bu't insist that Mullins was fully informed of the fact when the trade was made. They then propose that they will produce the relinquishment of Ivey, or a decree, of a Court of Chancery, divesting .him of all title to the land, within a reasonable time, and before complainant is ready to comply with his part of the contract.
They admit that several years before, Ivey had sold Ihe land to one Holland, but perhaps not in writing, but claim that Holland had paid him fully for the land; that Ivey had lived many years adjoining it and finally moved to Texas, all the time recognizing the land as Holland’s; that he knew of Holland’s selling it to Arnold, and that when Robert Mathis bought the land from Arnold, Ivey went with him on the land, and showed him the lines and corners, and .advised him to buy it, 'and -not only set up no claim, but told Mathis the title was good; and they insist that Ivey never intends to set up any title to the land; and that they believe Mullins was fully informed about it when he bought the land, or at any rate before he gave his notes for it.
*541 As to the allegations of the amended bill, defendants answer, admitting that the land was sold publicly; that it was announced that Jones had a mortgage on the land, and would join in the title bond, and then insisting that Mullins gave his notes for the purchase money with a full and fair explanation and understanding as to the title.
They deny that the title was in Sims’ heirs, and claim that at the time' of sale it was properly in them; and that since the sale to Mullins, it had been vested in him by regular deed, according to- the terms of sale.
They admit the sale of the land under the petition in Williamson County, as charged, and say that the land once belonged to John G. Sims, Sr., and that he died, leaving three minor children his heirs, to-wit: Walter H., Boyd W-, and John G. Sims, Jr.; that at the sale Walter H. Sims bought the 103 acres of land now in controversy, he being the oldest brother, the other two being miners; that John G. Sims, Jr., one of these heirs, died about the time stated in the amended bill, and it appears from another part of the record, intestate and without issue. They then claim that said Walter EL sold to Ivey, who took possession of the land, and 'Ivey had sold to Holland 40 acres of land, including the 25 acres, but they can not say whether by deed or other writing, but they know that no deed can be found on record.
They then state that since the filing of the original bill, Ivey had been written to in Texas, and had promptly made a deed for the land, which they will produce on the hearing. They then re-state substantially the matters of estoppel arising out of Ivey’s conduct, and insist on the statute of limitations as vesting the title as against him.
*542 There are other matters arising on the facts of the case as shown in the proof, which will be referred to, but these are the most material statements in the pleadings on which the questions for decision are raised.
We examine first, the questions presented on the original bill.
It is insisted that defendants should have set out their title in their answer, and that it should be accompanied by copies of their title papers, and this not being done, they must take the consequences of their failure to coipply with the law. For this proposition, the case of Boyer v. Porter is cited, 1st Tenn. E., Cooper’s ed., 258. That case was correctly decided, but is a very different case from this. There the bill was filed by a purchaser to enjoin a judgment on a note given for purchase money for land. The bill alleged generally that the vendor had no title to the land sold, so that it was not in his power to make a title. The defendant answered generally, and stated that it was in his power to convey the land, without stating how, or producing any title papers.
The Court say the defendant has not.shown us how he can make a title, though he has been particularly called upon to do it. The law is, that the title deeds, or copies, would be higher evidence than the defendant’s oath (to his answer) in the general way in which he has sworn ; the defendant ought'to prove the affirmative as to his title, unless he had produced or referred to deeds of recordas he did not do this, the judgment was enjoined, and the sale rescinded.
In the case now under consideration, the complainants have stated specifically the objections to the title of the *543 vendors, and have not called on them to deraign their title, and they are only called on to meet by their answer, the allegations of the bill. They have given a full statement in their answer, in which they have attempted to show, that the title alleged to be in Ivey is not in him, but really im themselves. Under the general allegations of this bill, however, that the vendors had no valid title to the land, we think the complainants might well show any defect in the title, that will be sufficient ground on which to enjoin the judgment or rescind the contract.
We may add further on this point, that the answer of defendants was not excepted to, but accepted as sufficient by complainants. .
The next question is, have defendants shown such a title to the 25 acres of land as a Court of Equity would compel a vendee to accept, or is the defect so made out that the Court, under well settled principles, should rescind the contract altogether. ■
In executory contracts, the rule is, that without alleging fraud, the mere failure of title to a part of the land purchased, which materially affects its value or constituted an inducement to the trade, gives the vendee the option to set aside and annul the whole contract, or to retain the part to which the title is good, and have a deduction from the consideration, to the extent of the value of the portion lost, in reference to the whole tract. Galloway and Pillow v. Bradshaw, 5 Sneed, 72; Buchanan v. Alwell, 8 Hum., 519.
There can be no question, that if the title fails to this 25 acres, or is not such a title as a Court of Equity would compel a vendee to accept, then it is a failure in a matter so material, as an inducement to the purchase, as would *544 entitle the complainant to a rescission of bis contract, or at his option, to an abatement of the price to the extent of the value of this 25 acres, in reference to the whole tract.
Upon the facts stated in the answer to the original bill, the complainants would clearly be entitled to a rescission of the contract on account of the title being in Ivey, nothing moré appearing in the case.
It is attempted to meet this by setting up an estoppel in pais, as against Ivey’s title, by the fact that he had recognized the title of his verbal vendee, and had encouraged purchasers under him to purchase the land, telling them the title was good, etc. While it is a well settled principle that in a Court of Equity, Ivey would not ■ be permitted to assert his title as against parties thus misled by him, and possibly even in a court of law, yet we can not assent to the doctrine that an estoppel, dependent upon facts to be proved by witnesses who may die at any time, or whose memory niay fail, or who may have removed out of the reach of the party needing them, when his title is to be maintained, is such a title as a Court of Equity would compel a vendee to accept under a contract for a good title.
In this country, where registration laws prevail,’ as a universal rule, the policy of our law; as well as sound principle, demands that titles to land should be preserved in a more stable form than an estoppel in pais, dependent on such a state of facts as is alleged in the answer of defendant to the original bill.
It is insisted:, however, that the statute of limitations has cured the defect.
*545 Where a title to land is clearly shown to have been perfected under the 1st section of the Act of 1819, and the right of the claimants absolutely extinguished by operation of that act, it would be a good title and such a one as a vendee would be compelled to accept: Goss v. Singleton, 2 Head, 79. Not so, however, where the mere possessory right of the legal owner of the land' is barred by operation of the second section of said Act: Gunningham v. Sharp, 11 Hum., 116; 2 Head, 79.
The proof shows, in this case, no such actual possession, of the land,, for the period necessary to form the bar of the statute and extinguish the title of Ivey, under a deed or assurance of title purporting to convey a fee simple under 1st section of the Act of 1819, as is required by the numerous decisions in our State on this subject.
But defendants say in their answer, that they will procure the title from Ivey within a reasonable time, before complainant is ready to comply with his part of the contract. It is well settled that, if a vendor can make a title before the final decree, the vendee will be compelled to accept it, fraud being out of the way. Has the party shown in this record, an after-acquired title from Ivey, such as the law requires? It must not be a doubtful title; it must be a valid, clear, legal title: Collins v. Smith, 1 Head, 255; Sebring v. Mersereau, 9 Cowan, 344.
Ivey made a deed to Aiken and wife, or what purports to be a deed, which is in the record, of date of 20th of March, 1858, which was, or appears to have been, acknowledged on that day before a Notary Public, in and for the county of Limestone, State of Texas.
*546 This deed is not such a deed as can give assurance of a good and valid legal title, for several reasons:
First. The specific description of the land is very indefinite and uncertain, so that it is very doubtful whether we could identify the land, as the land in controversy, from the description in the deed. The deed describes it, also, as the land sold to various parties by Holland and vendees, but does not refer to the deed of any one of them for a description of the land, nor even state that deeds were ever made.
Waiving this, however, and admitting that the land is sufficiently identified, which we do not positively decide, still the deed contains no warranty, either general or special, of the title. Its terms are: “I now, therefore, in consideration of the premises, do hereby convey and release, and quit claim to all of said 25 acres, to the said John C. Aiken, and wife, America Aiken, for the use and benefit of said America Aiken, as conveyed to her by the said James W. Wallace,- to have and to hold forever.” This is all of the deed.
This conveyance having been made after the Act of 1852, enacting that “the term heirs,” or other words of inheritance, shall not be requisite to create or convey an estate in fee, and that every grant shall hereafter pass all the estate or interest of the grantor, would convey the fee simple of the estate, if the same were properly proven and authenticated before us.
But, on looking at the certificate of acknowledgment of said deed before a Notary Public, in the State of Texas, the certificate fails to certify that he is personally acquainted with the bargainor, as required by our law. *547 This has always been held a fatal defect in such certificates: 7 Hum., 84; 1 Hum., 135; 5 Sneed, 692.
Such a probate is a nullity; so that this deed is before us in the record, without any legal authentication whatever.
There is another cloud upon the title to this land, as appears in this record, which would render the title doubtful. There appears an attachment bill, filed by Sarah J. Bnrdett v. Nathan Ivey, attaching this land, before the registration of the deed or noting of the same for registration by the Register, for a debt of about $316.
There was an amended bill filed in this case by complainants, to which Aiken and wife, and Jones, were made parties. While in the record, so far as we can look at it, there appears no final decree in this attachment bill, there is an order pro confesso, regularly taken against Ivey; and the answer of Aiken and wife set up no equity which would prevent a recovery by complainant in that case against Ivey; so that, as far as we can see, the land is liable to be sold under that proceeding, and is, as far as appears in this record, subject to the lien of the attachment in that proceeding.
It is true, there appears among the papers in this case, what purports to be the receipt of Whitthorne, Clerk and Master, for the money paid in satisfaction and discharge of the claim of Sarah Burdett in the attachment bill. This receipt can not be looked to for any purpose, as it is simply a loose paper, with nothing upon it showing it to be a part of the record, and is dated November 16, 1860, while the appeal in this case was *548 prayed, and granted at May Term, 1860, and bond given, dated 25th. June, 1860.
' With such an encumbrance on the land, we can not say the title is clear and beyond dispute, or that it is not a questionable one, so doubtful, that it would not be a compliance with the contract of Aiken and wife, and Jones, the defendants, if conveyed to complainants. In the language of Judge McKinney, in Cunningham v. Sharp, 11 Hum., 118, “all the books concur in the principle that a purchaser will not be compelled to accept a doubtful title.”
With this view of the law and facts of this case, we need not examine the questions raised on the amended bill, the allegations of fraud, nor the'validity of the title alleged to be in the heirs of John G. Sims; or rather we do not deem it necessary to decide these questions, the matters discussed being conclusive of the case.
Another question of ■ some importance is presented, which we deem it proper to decide.
It seems that a number of papers read on the trial of the case before the Chancellor, were not filed in that court, nor made part of the' record at the time of hearing, or before. These papers not appearing in the record, as sent up to this Court at December Term of this Court, 18G6, a certiorari was awarded to the Clerk and Master of the Chancery Court at Shelbyville, to send up a more perfect record, the object being to get certain deeds that seem to have been read, from the Register’s books perhaps, or referred to by counsel in their briefs, on the hearing of the cause, at the May Term, 1860.
The papers not being on file, at the May Term 1867 *549 tbe defendants made a motion in tbe Chancery Court at Shelbyville, for leave to be allowed to file copiés of a deed from Robert Mathis to James W. Wallace, dated 23d October, 1854; and of a deed from Robert Matthews to James Wallace for 157 acres of land, dated 27th February, 1856; and of a' deed from James W. Wallace to America Aiken, the defendant, dated April, 1856; and of a deed from John C. Aiken and wife to James Mullins for 100 acres of land, as parts of the record in this case; and for leave to show by proof before the Court, that said deeds were read as evidence before the Chancellor, at the hearing of said cause, at May Term, 1860; and for an order of the Court, that the Clerk shall certify said copies as parts of the record in this cause, in answer to a certiorari awarded by the Supreme Court.
Upon this motion, proof -was taken in the form of various depositions, which we need not examine, except to remark that it presents the usual defects in such proof— that is, a want of memory as to how the facts were precisely, on the part of honest witnesses, who are detailing their recollection of occurrences happening seven years before.
The then Chancellor, however, on the evidence submitted, and after argument of counsel, made a decree, in which he recites that he is satisfied, from the testimony of two witnesses on file, that, on the trial of this case, at the May Term, 1860, before the Hon. B. L. Ridley, the former Chancellor, the deeds referred to in the motion, “were read, (of the reading was waived by adverse counsel,) from the Register’s books of Bedford .county; and he ordered and decreed, that said defendants be per *550 mitted to file copies of said deeds, with the records of this cause, in this the Chancery Court;” and then decreed that the Clerk and Master should certify copies of said deeds as parts of the record in this cause, in obedience to the certiorari awarded from the Supreme Court.
The decree then recites that, at the hearing of this motion, the reading of the statement of W. H. Wisener, Sr., was objected to by defendant’s counsel, on the ground that he tvas interested, and therefore is incompetent, stating the ground of such in competency; from which decree an appeal was prayed and granted, to this Court. No bond, however, seems to have been given for said appeal.
The Clerk and Master then made out a transcript of the proceedings on this motion, with depositions taken upon it, and, as he says, in obedience to an order of the Chancery Court, and certifies that the. deeds referred to, as copied in the transcript, are true copies, &c., of the papers read before the Chancellor on the former hearing of the cause, at the May Term, 1860; and the other parts of the transcript he certifies to be a copy of proceedings had in the Chancery Court at Shelbyville, at May Term, 1867, and September Term, 1867, on trial of said motion.
Can we look at these proceedings, and recognize them as part of the record in this case?
The Code provides that any record or paper filed in an action, either at law or equity, if lost or mislaid unintentionally, or fraudulently made away with, may be supplied upon application, under the orders of the Court, *551 by the best evidence the nature of the case will admit of: Code. 3907.
We can not see any authority in this provision for this proceeding. The motion was not made to .supply a lost record, or one mislaid unintentionally, or fraudulently made away with. In fact, it is not assumed that the papers were ever on file, or made a part of the record in the Chancery Court at all.[1] The proof taken on the motion shows the fact to be, that they never were filed in said court. We can find no authority in the statute for manufacturing a record to be sent to this Court and thereby supplying defects found in transcripts sent here.
Rule 15, for the regulation of the practice in our Chancery Courts, found in the Code, p. 981, is, that all deeds, transcripts of records, or other written documents, intended to be offered as testimony on the hearing of a cause, by either party, shall be filed with the Clerk, before the cause shall be heard, and if filed during the term at which the cause is heard, notice thereof, at least one day, shall be given to the adverse counsel.
The parties having failed to file their papers, and thereby make them part of the record, must abide the result. We can see no authority given the Chancery Court to make a record, or have papers filed and made part of the record, after the hearing of the cause, that were not made part of the record before the hearing, as the law directs.
We deem the practice a dangerous one, such as we *552 can not sanction, to allow parties by parol • proof, years after the case is determined, to supply and add to the records of the courts of the country, and thus make up the proceedings of the court, not from the entries made at the time the proceedings occurred, but from the uncertain memory of witnesses.
This is not a case for remanding the cause to an inferior court to supply a lost record, as in Seay v. Hughes, 5 Sneed, 155, because it does not appear that any portion of the record has been lost. On the contrary, it appears distinctly, that the papers desired never were a part of the records of that court.
With the papers here referred to, out of the case, as we are bound to treat them, it can not be pretended that defendants have shown a title to the twenty-five acres of land, such as they contracted to make. If they-were in the record, and could be considered by us, we might find more difficulty in the decision of this case.
With this view of the case, we are constrained to reverse the decree of the Chancellor, and rescind the contract for the sale of the land, perpetually enjoining the collection of the notes given for the purchase money; and remanding the same for account of rents, allowing Mullins for such permanent improvements as have enhanced the value of the land.
Defendants will pay the costs in this Court, and complainants the costs in the court below.

 See Baker v. Mayor and Aldermen of McMinnville, ante, 117.